| | |
|---|---|
| SUPERIOR COURT<br>CUMBERLAND, ss | Civil Action No. CV10-410 |
| MICHAEL FERRARO, of<br>Scarborough, Maine<br><br>   PLAINTIFF<br><br>vs.<br><br>UNUM LIFE INSURANCE<br>COMPANY OF AMERICA, a Maine<br>corporation resident in Portland,<br>County of Cumberland, Maine<br>and;<br><br>UNUM GROUP, formerly known<br>as UnumProvident Corporation, a<br>Delaware corporation and;<br><br>PROFESSIONAL DISABILITY<br>ASSOCIATES LLC, a Maine<br>corporation with headquarters in<br>Portland, Maine and;<br><br>   DEFENDANTS | COMPLAINT<br><br><br><br>Jury Trial Demanded |

## Count I – Breach of contract

1. Michael Ferraro is a resident of Scarborough, Maine and Unum Life Insurance Company of America (Unum Life) is a resident of Portland, Maine, both in Cumberland County.

2. Michael Ferraro was insured under a policy issued by Unum Life Insurance Company, Policy Number 579169, which promised long term disability insurance protection to employees of Summit Automotive, LLC

1

(d/b/a Berlin City Maine Mall Motors) upon their election to purchase such coverage.

3. All premiums were paid by the employees of Summit Automotive, LLC (Berlin City Maine Mall Motors) who elected to become covered under Unum Life Policy 579169.

4. The role of the Plaintiff's employer, Summit Automotive, LLC (Berlin City Maine Mall Motors) with respect to the policy at issue was limited to deducting premium payments from the electing employees for transfer to Unum Life. There was not even any mention of Unum's name in the Employee Benefits handbook given to Maine Mall Motors employees.

5. The insurance coverage provided by Unum Life and paid for in full by employees was not part of an employer-sponsored employee benefit plan but was simply offered by Unum Life sales personnel to Summit employees following a sales presentation by the former.

6. The Plaintiff, Michael Ferraro, rejected the option of short term disability coverage, also offered by Unum Life, but chose to purchase insurance coverage under the long term disability plan (LTD) offered by Unum Life.

7. The policy at issue promised to pay 60% of a disabled employee's pre-disability income (to a maximum of $10,000 a month) in the event a covered employee could not perform the material and substantial duties of his own occupation for two years of disability, and the duties of any occupation after the payment for two years of disability. (Policy 579169 attached as Complaint Exhibit 1.)

8. While at work, and while covered under the Unum Life policy at issue, the Plaintiff became ill with a Myobacterium Avium Complex infection (MAC) exacerbated by an underlying non-HIV immune deficiency and asthma and which rendered him unable to adequately perform the duties of his own occupation as General Manager responsible for three dealerships and which required a work-week of at least 60 and sometimes 70 hours.

9. The Plaintiff's illness caused him to suffer from fatigue, lack of energy, and a compromised ability to focus and concentrate on the work activities required of him.

10. The decline in his productivity led to the termination of his employment on April 9, 2009 (his last day worked was April 8, 2009).

11. The Plaintiff's illnesses proximately caused the decline in the Plaintiff's ability to perform his job duties which in turn proximately caused the termination of his employment.

12. The Plaintiff submitted an initial application for long term disability benefits under the Plan but his claim was denied.

13. The Plaintiff appealed the initial denial of his claim showing that there was no factual basis for that denial, and further that the denial violated the provisions of the Regulatory Settlement Agreement executed between the state of Maine and 47 other states and Unum Life in 2004.

14. Unum Group contracted with Professional Disability Associates (PDA), a third-party contractor which works with insurers to provide "independent" physician paper reviews among other services.

15. PDA maintains a list of physicians willing to provide "paper reviews" of claimants' files which are generally biased to favor the position of insurance companies such as Unum Life.

16. PDA solicited such a review of the Plaintiff's file from Allen Blaivas, D.O. on behalf of Unum Group.

17. Dr. Blaivas lists himself in his correspondence on PDA's letterhead as a medical consultant for PDA.

18. Dr. Blaivas' first report was received by Unum Group benefits personnel on January 22, 2010.

19. The initial report from Dr. Blaivas was actually favorable to the Plaintiff's claims.

20. On or about March 4, 2010 Unum Group employees notified the Plaintiff that his benefits were going to be granted after all because they had reconsidered and found him disabled from April 9, 2009 to February 10, 2010.

21. However, Veronica Hargrave, Unum Group's "appeals" decision maker for this case called on Dr. Blaivas and solicited a second opinion which this time was slanted in favor of Unum's desire not to pay benefits and was used to terminate the Plaintiff's benefits as of February 10, 2010.

22. There is no transcript of that ex parte phone call with the medical expert.

23. The final letter from Unum Group stated that the Plaintiff would not be paid any benefits beyond February 10, 2010, even though under the terms

of the Plan he was entitled to benefits for his inability to do his own occupation for two years, an additional 17 months.

24. Unum's denial of further benefits to the Plaintiff breached Unum Life's insurance contract with the Plaintiff since the Plaintiff had not recovered to the point of being able to perform his own occupation.

25. The policy which is the subject of this lawsuit was issued in Maine, and renewed in Maine.

26. Under the terms of the contract the Plaintiff is entitled to receive $10,000 per month while disabled.

27. The contract between Unum Life and the Plaintiff was a binding two-party contract.

28. However, at no time did any employee of Unum Life review, ratify, or have any input into the decision to pay only limited, minimal benefits to the Plaintiff on account of his disability.

WHEREFORE, the Plaintiff prays that this Honorable Court award him all damages resulting from the breach of his disability contract with Unum Life Insurance Company of America, measured by the amounts he should have received and should continue to receive with future benefits being reduced to present value. The Plaintiff also prays for an award of costs, interest, and attorney fees.

### Count II – Tortious interference with contractual relationships and economic expectations against defendant Unum Group Corporation

29. Paragraphs 1 through 28 are hereby incorporated into Count II as though fully set forth herein.

5

30. Unum Group was not a party to the disability insurance contract which is the subject of this lawsuit.

31. Unum Life and Unum Group are distinct and different corporate entities.

32. Unum Life is a licensed Maine insurance company, while Unum Group is incorporated in Delaware and is not and never has been an insurance company, nor is it licensed to issue insurance policies or to engage in the business of insurance.

33. As a parent corporation, Unum Group was in a position to exercise authority through intimidation over Unum Life and did so in this case, causing the denial of Plaintiff's claim.

34. No employee of Unum Life ever had any part in the denial of the Plaintiff's claim.

35. At the time the Plaintiff's claim was submitted to Unum, Unum Group was and continued to institute a policy of "aggressively managing claims", a euphemistic phrase which denotes a variety of methods for dishonestly denying, terminating, or otherwise reducing the amount of money paid out by Unum Life on legitimate claims.

36. Unum Group employees made numerous misstatements of fact to the Plaintiff in rationalizing the initial denial and in rationalizing subsequent partial payment of his claims.

37. There being no rational basis for any of Unum's factual misrepresentations, they can only be said to have been advanced for the

purpose of interfering with the Plaintiff's entitlement to disability benefits under his contract with Unum Life.

38. The conduct of Unum Group in causing the breach of the disability insurance contract between Unum Life and the Plaintiff and the breach of the RSA and the Plaintiff was intentional and constitutes such deliberate conduct by Defendant Unum Group that, even though motivated by something other than ill will to any particular party, is so outrageous that malice toward the person injured in this case as a result of that conduct must be implied.

WHEREFORE, the Plaintiff prays for an award of past due benefits under his individual disability policy plus the amount of all future benefits reasonably expected to be due to him under said policy as a result of the Defendant's breach of the promises contained within the Unum Life policy. Additionally the Plaintiff prays this Court award him punitive or exemplary damages against Unum Group for engaging in and conspiring to engage in malicious and widespread social harm caused by the institution of a biased claims handling practice within the state of Maine.

### Count III – Unfair claims settlement practices: violation of 24-A M.R.S.A. § 2436-A against Unum Life as issuing insurer

39. Paragraphs 1 through 38 are hereby incorporated into Count III as though fully set forth herein.

40. The defendant Unum Life through its agents knowingly misrepresented to the insured pertinent facts concerning policy provisions and coverage issues.

41. Among such misrepresentations is an unlawful policy provision conveying discretionary authority to the insurer and Unum's representation that this claim is governed by ERISA. These representations were interposed to delay and frustrate the progress of this case and only resulted in increased expense and delay to the Plaintiff.

42. The defendant Unum Life failed to acknowledge and review the Plaintiff's claim within a reasonable time following the receipt by the insurer of the claim arising under a Unum Life policy.

43. At Unum's instance the Plaintiff filed an appeal of Unum's most recent denial which was rejected on grounds that were based on a distortion of the Plaintiff's record and a misrepresentation of the terms of Unum's contract provisions.

WHEREFORE, the Plaintiff prays for an award of reasonable costs, disbursements, attorney fees, and interest on benefits paid late and benefits paid in response to this lawsuit at the rate of 1.5% per month.

### Count IV- Intentional Infliction of emotional distress against all defendants

44. Paragraphs 1 through 43 are hereby incorporated into Count IV as though fully set forth herein.

45. The conduct of the Defendants in conspiring to deny the Plaintiff LTD benefits intentionally or recklessly inflicted severe emotional distress through action that was certain or substantially certain to cause severe emotional

distress since the denial of disability benefits leaves disabled insureds without promised resources when they are at their most vulnerable and helpless.

46. The conduct of the Defendants in disregarding the rights of a disabled individual, the Plaintiff in this case who was dependent on disability payments was and is so extreme and outrageous as to exceed all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community.

47. The actions of the Defendants caused the Plaintiff extreme emotional distress and his emotional distress was so severe that no reasonable person could be expected to endure it.

48. The infliction of emotional distress was malicious as a matter of law.

WHEREFORE, the Plaintiff prays for an award of consequential and punitive damages sufficient to compensate him for the emotional distress he has suffered and to serve as an example to the Defendants that they cannot emotionally abuse people for the purpose of deterring them from making claims for benefits to which they are reasonably entitled.

### Count V – Intentional interference with contract and economic expectation by defendants Professional Disability Associates, and Unum Group

49. Paragraphs 1 through 48 are hereby incorporated into Count V as though fully set forth herein.

50. Professional Disability Associates (PDA) is a limited liability corporation incorporated in and under the laws of the state of Maine.

51. PDA represents and sells itself and its services to employers and insurance companies with the promise of being able to save money for its clients by reducing the costs involved in "managing claims" based on disability of insureds and employees.

52. "Managing claims" or claims management in the insurance industry is a euphemistic phrase for rationalizing ways of reducing or terminating disability claim benefits.

53. In the instant case, an employee of Unum Group, Veronica Hargrave, sought to avoid full payment of Plaintiff's claim by obtaining a medical report from PDA which she could use as a basis for denying Ferraro's claims.

54. PDA maintains lists of physicians who it fully understands will deliver reports favoring or usually favoring the interests of insurance companies.

55. PDA conspired with Unum Group and through the use of intimidation and pressure induced Allen Blaivas, D.O. to act as its agent and to violate the Code of Medical Ethics of the American Medical Association (2008-2009 edition) by ultimately producing and issuing a report containing what purported to be expert opinion evidence and testimony but which violates certain principles of medical ethics and guidelines of the American Medical Association (AMA). In particular, the medical opinion produced by the conspiracy between Unum Group, PDA, and Allen Blaivas violates:

   a. Principle II – A physician shall uphold the standards of professionalism, be honest in all professional interactions, and strive to report

physicians deficient in character or competence for engaging in fraud or deception to appropriate entities;

b. Opinion 9.07 of the AMA Ethical Opinions requiring that physicians choosing to provide expert testimony "be committed to evaluating cases objectively and to providing an independent opinion reflecting current scientific thought and standards of care that have gained acceptance among peers in the relevant field." Additionally Opinion 9.07 holds that physician testimony "must not be influenced by financial compensation..."

c. Opinion 8.02 holds that "the ethical obligations of physicians are not suspended when a physician assumes a position that does not directly involve patient care. Rather these obligations are binding on physician in non-clinical roles to the extent that they rely on their medical training, experience, or perspective." and;

d. Opinion 8.0501 which advises that "physicians should not sign contracts containing provisions that may undermine the ethical obligation to advocate for patient welfare."

56. The violations in the previous paragraphs are evident in a comparison between his initial report which favored the Plaintiff and his second which did not. Unum conceded in its second vocational assessment that the Plaintiff's occupation required long hours as follows: "the work hours for top executive positions such as the one held by this claimant require long hours, including evenings and weekends" and "specific limitations to a 40-45 hour per week or to work performed on an occasional overtime basis would not

be considered compatible with the expected weekly work-hour demands of the claimant's occupation".

57. Initially in his first report of January 22, 2010, Dr. Blaivas stated that "given all of the above and realizing the chronic nature of presumed MAC infection and the claimant's increased susceptibility to infection especially with overwork, a limitation of 40-45 hours per work-week (to allow for occasional overtime) starting on 04/08/09 and at least through the time of the last progress note of 10/16/09 afforded to me for review is reasonable and, in fact, is similar to stated restrictions of one of the claimant's treating physicians."

58. Dr. Blaivas also noted that "MAC infection can result in **severe fatigue**" as noted in office visit notes by attending doctors Kahn and Courtney, even prior to the date of dismissal.

59. Veronica Hargrave of Unum Group, solicited from PDA a second report from Dr. Blaivas based on a false representation that a new attending physician's partial exam report warranted yet another assessment in an attempt to sway the evidence more to the liking of Unum Group and Unum Life.

60. In his new report of February 24, 2010 generated following Hargraves' ex parte phone call Dr. Blaivas stated, "The MAC infection **appears** to be improving". (Emphasis added)

61. Dr. Blaivas in his second report also states that the Plaintiff's reports of fatigue are "self-reported and there is no clinical evidence to support this

complaint such as a sleep study to diagnose a cause for hypersomnia, nor a multiple sleep latency test to confirm daytime sleepiness".

62. Dr. Blaivas in his second report adds gratuitously that "there is also no evidence that the previously documented waxing and waning respiratory issues have persisted". Dr. Blaivas intentionally ignored the limitations of the office note he reviewed. While there had been no substantive changes in the patient's health, Dr. Blaivas' conclusion stated without supporting evidence that "it **seems reasonable** to conclude that as of 02/10/10 the insured **should** have no significant work restriction and may return to full work schedule without significant restriction". (Emphasis added)

63. Unum Group used PDA/Blaivas' assessment to terminate the Plaintiff's benefits as of February 10, 2010.

64. In inducing and intimidating Dr. Blaivas into agreeing to provide a second report, PDA and/or Unum Group used the influence of financial compensation to secure a change in testimony contrary to AMA Ethical Opinion 9.07 and further intimidated and induced Dr. Blaivas to leave any professional expertise he lays claim to behind him and to engage in sheer speculation as reflected in his use of phrases like "what should be", "what seems reasonable to conclude", and "what appears to be the case" when in fact he had absolutely no basis for uttering such statements as part of an objective medical opinion.

65. PDA also induced agreement from Dr. Blaivas to contravene AMA Ethics Opinion 8.02 in ignoring that "the ethical obligations of physicians are not suspended when a physician assumes a position that does not directly

13

involve patient care. Rather these obligations are binding on physician in non-clinical roles to the extent that they rely on their medical training, experience, or perspective." In point of fact, Dr. Blaivas simply abandoned his professionalism in the face of intimidation from Unum Group and PDA and misused his medical credentials to advocate against the Plaintiff's interests and in favor of those of Unum Group and PDA.

66. Neither Dr. Blaivas nor PDA nor Unum Group are parties to the contractual relationship between Unum Life and the Plaintiff.

67. The termination of the Plaintiff's disability benefits was achieved and rationalized through the use of distorted, false, intentionally biased, and fraudulent information secured by PDA and Unum Group and produced by Allen Blaivas, D.O.

68. The termination of the Plaintiff's benefits (or rather the truncation of those benefits) breached the contract of insurance between Unum Life and the Plaintiff.

69. The breach was proximately caused by the tortious interference with the Plaintiff's economic and contractual rights and expectation.

70. Unum Group and PDA using the intimidation inherent in a threat not to use Dr. Blaivas' services again secured a second report specifically geared toward rationalizing the termination of benefits due to the Plaintiff in accordance with his contractual relationship with Unum Life.

71. The use of such tactics was intentional on the part of PDA and Blaivas and resulted in victimizing a disabled individual in a manner that was

certain or substantially certain to cause emotional distress, and disregarded the rights of a disabled individual, the Plaintiff, who was dependent on disability benefits for the purpose of retaining Unum Group as a client.

71. PDA knew or should have known Unum Group sought an opinion for the purpose of defeating the Plaintiff's disability claim, and intended that result.

72. The conduct of PDA, and Unum Group was so extreme and outrageous as to exceed all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized society. The actions of PDA and Unum Group were malicious as a matter of law and entitle the Plaintiff to recover compensatory and punitive damages since PDA and Unum Group's actions proximately caused the Plaintiff's disability benefits to be terminated.

WHEREFORE, the Plaintiff prays for awards of consequential and punitive damages against Defendants sufficient to compensate him for the deprivation of his disability benefits and his source of income during the period of his disability for which he was contractually entitled to receive payment from Unum Life and to deter such future conduct by PDA and Unum Group in similar circumstances.

8/17/10
Date

/s/ Jon Holder, Esq.
Attorney for the Plaintiff
Maine Bar # 001463
Holder & Grover, PA
P.O. Box 920
Bar Harbor, ME 04609
(207) 288-1220
jon@holderandgrover.com